1  Laurence D. King (SBN 206423)
   lking@kaplanfox.com
2  KAPLAN FOX & KILSHEIMER LLP
   350 Sansome Street, Suite 400
3  San Francisco, CA 94104
   Telephone: 415-772-4700
4  Facsimile:  415-772-4707

5  Local Counsel for Plaintiff

6  Karen H. Riebel
   khriebel@locklaw.com
7  Elizabeth R. Odette
   erodette@locklaw.com
8  LOCKRIDGE GRINDAL NAUEN, P.L.L.P
9  100 Washington Avenue, Suite 2200
   Minneapolis, MN 55402
10 Telephone.:  612-339-6900
   Facsimile:  612-339-0981
11
   Additional Attorneys on signature page
12

13                UNITED STATES DISTRICT COURT

14                NORTHERN DISTRICT OF CALIFORNIA

15

16 EUGENE L. HAMMER, on behalf of himself      )  Case No.:
   and all others similarly situated,          )  CV 07                5825
17                                             )  CLASS ACTION
                   Plaintiff,                   )
18                                             )  **CLASS ACTION COMPLAINT FOR**
         vs.                                    )  **VIOLATIONS OF THE FEDERAL**
19                                             )  **SECURITIES LAWS**
   BIGBAND NETWORKS, INC., AMIR               )
20 BASSAN-ESKENAZI, FREDERICK A.              )
   BALL, RAN OZ, LLOYD CARNEY, DEAN           )
21 GILBERT, KEN GOLDMAN, GAL                  )
   ISRAELY, BRUCE SACHS, ROBERT               )  **JURY TRIAL DEMANDED**
22 SACHS, and GEOFFREY YANG,                  )
                   Defendants.                  )
23                                             )
                                               )
24

25

26

27

28
   ───────────────────────────────────────
   CLASS ACTION COMPLAINT

1    Plaintiff, Eugene L. Hammer ("Plaintiff"), individually and on behalf of all other persons
2    similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiffs'
3    own acts, and upon information and belief as to all other matters, based on, inter alia, the
4    investigation conducted by and through Plaintiff's counsel, which included, among other things: a
5    review of the Defendants' public documents, conference calls and announcements made by
6    Defendants; United States Securities and Exchange Commission (the "SEC") filings by BigBand
7    Networks Inc. ("BigBand" or the "Company") and its related entities; wire and press releases
8    published by and regarding BigBand; securities analysts' reports and advisories about the Company;
9    and information readily obtainable on the Internet.

10    ## NATURE OF THE ACTIONS

11    1.    This is a federal class action brought by Plaintiff on behalf of all purchasers of BigBand
12    common stock between March 14, 2007, and September 27, 2007, (the "Class Period") against BigBand
13    and certain of its officers and directors ("Defendants").  Purchasers include those who purchased
14    BigBand common stock pursuant or traceable to the Company's amended registration statement given
15    effect on March 14, 2007 ("Registration Statement") through a Form S-1 SEC filing, and the prospectus
16    dated March 14, 2007, (individually and collectively with the Registration Statement, the "Prospectus")
17    issued in connection with the Company's initial public offering on or about March 14, 2007, (the
18    "Offering" or the "IPO").  Plaintiff seeks to pursue remedies under the Securities Act of 1933 (the
19    "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

20    2.    BigBand develops, markets, and sells broadband multimedia infrastructure for video,
21    voice and data enabling cable operators and telephone companies to offer voice, video and data service
22    across coaxial fiber and copper networks.  BigBand is incorporated in Delaware and headquartered in
23    Redwood City, California.  The Company has research and development facilities in Westborough,
24    Massachusetts, Tel Aviv, Israel and Redwood City, California.

25    3.    On March 14, 2007, BigBand and Company insiders completed an IPO, selling 7.5
26    million shares of BigBand common stock from the Company and 4.8 million shares of BigBand

27

28    CLASS ACTION COMPLAINT

1

1   common stock from selling stockholders, for a total of 12.3 million shares at $13 per share for gross
2   proceeds totaling $159.9 million.

3      4.      During the Class Period, however, Defendants made false and misleading statements
4   regarding the Company's business prospects, financial results and forward guidance. Defendants failed
5   to disclose that the Company had achieved revenue growth and profitability at the end of 2006 only as a
6   result of non-recurring orders from Verizon Communications Inc. ("Verizon").  As a result, BigBand
7   would not achieve further revenue growth from Verizon until Verizon worked off the inventory
8   purchased in late 2006 and early 2007.  Rather, Defendants stated that BigBand would achieve
9   aggressive revenue and profit projections, misrepresenting and omitting the truth with regard to
10  Verizon's need to deplete its excess inventory.  BigBand also failed to disclose that delays were
11  occurring in the customization of certain customer specific products involving switched digital video
12  ("SDV") technology.  The viability of the Company's cable modem termination system ("CMTS") was
13  also in doubt.  Not only were these problems contributing to its failure to achieve revenue and profit
14  projections, they caused the Company to lack an objectively reasonable basis to make business
15  projections and forward guidance during the Class Period.

16     5.      After the market closed on September 27, 2007, the Company, through a press release,
17  revealed the truth of its product development problems.  BigBand announced that it was revising its
18  revenue outlook for the third quarter ending September 30, 2007.  The Company revealed that it now
19  expected to report revenue for the third quarter in the range of $35 million to $39 million, as much as
20  $23 million below the Company's previous guidance of $54 million to $58 million.  BigBand attributed
21  the dramatic decline in expectations to one customer, not named but assumed to be Verizon, having
22  excessive inventory of BigBand's products and with no expectation to increase its purchases in the
23  immediate future.  The press release also revealed that BigBand was having difficulty obtaining
24  customer acceptance of other products necessary for revenue recognition.  BigBand stated that all these
25  issues were expected to persist for a number of quarters.

26     6.      On this news, shares of the Company's stock fell nearly $2.67 per share, or 29.4 percent,
27  to close, on September 28, 2007, at $6.40 per share.

28  CLASS ACTION COMPLAINT

2

1

**JURISDICATION AND VENUE**

2       7.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the

3  Securities Act [15 U.S.C. §§ 77k and 77o] and Sections 10(b) and 20(a) of the Exchange Act, [15 U.S.C.

4  §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

5       8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of

6  the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C §

7  1331.

8       9.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, [15

9  U.S.C. § 78aa] and 28 U.S.C. § 1391(b).  BigBand maintains its corporate offices in this District and

10  many of the acts and transactions alleged herein occurred in substantial part in this Judicial District.

11       10.    In connection with the acts, conduct and other wrongs alleged in this complaint,

12  Defendants, direct or indirectly, used the means and instrumentalities of interstate commerce, including

13  but not limited to, the United States mails, interstate telephone communications and the facilities of the

14  national securities exchange.

15

**THE PARTIES**

16       11.    Plaintiff Eugene L. Hammer, a resident of Savannah, Georgia, purchased BigBand

17  publicly traded securities as described in the attached Certification during the Class Period at artificially

18  inflated prices and was damaged thereby.

19       12.    Defendant BigBand Networks Inc., founded in 1998, provides broadband multimedia

20  infrastructure for video, voice and data.  BigBand is a Delaware corporation, with its principal place of

21  business at 475 Broadway Street, Redwood City, California 94063.

22       13.    Defendant Amir Bassan-Eskenazi ("Bassan-Eskenazi") was, at all relevant times, the

23  Company's Chief Executive Officer, President, Co-founder and Chairman of the Board of Directors.

24  Defendant Bassan-Eskenazi signed the Company's Registration Statement, assisted in the preparation of

25  the false financial statements, and repeated the contents therein to the market.  Defendant Bassan-

26  Eskenazi sold 400,000 shares in the BigBand IPO for proceeds of $4.83 million.

27

28

1    14.    Defendant Frederick A. Ball ("Ball") was, at all relevant times, the Senior Vice President,
2  Chief Financial Officer, and Principal Accounting Officer of BigBand. Defendant Ball signed or
3  authorized the signing of the Company's false and misleading Registration Statement, assisted in the
4  preparation of the false financial statements and repeated the contents therein to the market.

5    15.    Defendant Ran Oz ("Oz") was, at all relevant times, BigBand's Chief Technology
6  Officer, Co-founder and a Director of the Company. Defendant Oz signed the Company's Registration
7  Statement via a power of attorney granted to Company Vice President and General Counsel, Robert
8  Horton. Defendant Oz serves as a Director on behalf of Oz Holdings, Inc. Defendant Oz and/or Oz
9  Holdings, Inc. sold 400,000 shares in the IPO for proceeds of $4.83 million.

10    16.    Defendant Lloyd Carney ("Carney") was, at all relevant times, a Director of the
11  Company. Defendant Carney signed the Company's Registration Statement via a power of attorney
12  granted to Company Vice President and General Counsel, Robert Horton. Defendant Carney sold
13  20,000 shares in the IPO for proceeds of $260,000.

14    17.    Defendant Dean Gilbert ("Gilbert") was, at all relevant times, a Director of the Company.
15  Defendant Gilbert signed the Company's Registration Statement via a power of attorney granted to
16  Company Vice President and General Counsel, Robert Horton. Defendant Gilbert serves on BigBand's
17  Board as the representative of Sandalwood Investments II, L.P. Defendant Gilbert and/or Sandalwood
18  Investments sold 20,109 shares in the BigBand IPO for proceeds of $243,117.

19    18.    Defendant Ken Goldman ("Goldman") was, at all relevant times, a Director of the
20  Company. Defendant Goldman signed the Company's Registration Statement via a power attorney
21  granted to Company Vice President and General Counsel, Robert Horton.

22    19.    Defendant Gal Israely ("Israely") was, at all relevant times, a Director of the Company.
23  Defendant Israely signed the Company's Registration Statement via a power of attorney granted to
24  Company Vice President and General Counsel, Robert Horton. Defendant Israely serves on BigBand's
25  Board on behalf of Cedar Funds. Cedar Funds sold 446,229 shares in the BigBand IPO for proceeds of
26  approximately $5.4 million.

27

28  CLASS ACTION COMPLAINT

4

1    20.    Defendant Bruce Sachs ("B. Sachs") was, at all relevant times, a Director of the

2  Company. Defendant B. Sachs signed the Company's Registration Statement via a power of attorney

3  granted to Company Vice President and General Counsel, Robert Horton. Defendant Sachs is General

4  Partner of Charles River Ventures and serves as Charles River's designee on BigBand's Board of

5  Directors.

6    21.    Defendant Robert Sachs ("R. Sachs") was, at all relevant times, a Director of the

7  Company. Defendant R. Sachs signed the Company's Registration Statement via a power of attorney

8  granted to Company Vice President and General Counsel, Robert Horton.

9    22.    Defendant Geoffrey Yang ("Yang") was, at all relevant times, a Director of the Company.

10  Defendant Yang signed the Company's Registration Statement via a power of attorney granted to

11  Company Vice President and General Counsel, Robert Horton. Defendant Yang is a Partner at Redpoint

12  Ventures, and serves on BigBand's Board of Directors as the designee of Redpoint Ventures. Defendant

13  Yang and/or Redpoint Ventures sold 15,000 shares for proceeds of $195,000.

14    23.    Defendants Bassan-Eskenazi, Oz, Carney, Gilbert, Goldman, Israely, B. Sachs, R. Sachs

15  and Yang are collectively referred to hereinafter as the Individual Defendants.    The Individual

16  Defendants, because of their positions with the Company, possessed the power and authority to control

17  the contents of BigBand's quarterly reports, press releases and presentations to securities analysts,

18  money and portfolio managers and institutional investors, *i.e.*, the markets. Each Individual Defendant

19  was provided with copies of the Company's reports and press releases alleged herein to be misleading

20  prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

21  cause them to be corrected. Because of their positions, each of these Individual Defendants knew that

22  the adverse facts specified herein had not been disclosed and were being concealed from the public and

23  that the positive representations which were being made were then materially false and misleading.

24  Individual Defendants are liable for the false statements pleaded herein, as those statements were each

25  "group published" information, the result of the collective actions of the Individual Defendants.

26

27

28    CLASS ACTION COMPLAINT

5

1

**SCIENTER**

2      24.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public

3  documents and statements issued or disseminated in the name of the Company were materially false and

4  misleading; knew that such statements or documents would be issued or disseminated to the investing

5  public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of

6  such statements or documents in violation of the federal securities laws. As set forth elsewhere herein in

7  detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding BigBand,

8  their control over, and/or receipt and/or modification of BigBand's allegedly materially misleading

9  misstatements and/or their associations with the Company which made them privy to confidential

10  proprietary information concerning BigBand, participated in the fraudulent scheme alleged herein.

11

**CLASS ACTION ALLEGATIONS**

12     25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure

13  23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the publicly traded securities of

14  BigBand during the Class Period, including purchasers of BigBand securities pursuant or traceable to the

15  Registration Statement and Prospectus issued in connection with the Company's IPO (the "Class").

16     26.     Excluded from the Class are Defendants, the officers and directors of the Company at all

17  relevant times, members of their immediate families and their legal representatives, heirs, successors or

18  assigns and any entity in which Defendants have or had a controlling interest.

19     27.     Questions of law and fact common to the members of the Class which predominate over

20  questions which may affect individual Class members include:

21          i.   Whether the federal securities laws were violated by Defendants by the acts alleged

22             herein;

23         ii.   Whether Defendants omitted and/or misrepresented material facts to the investing

24             public during the Class Period about the business, operations and management of

25             BigBand;

26        iii.   Whether Defendants' statements omitted material facts necessary to make the

27             statements made, in light of the circumstances under which they were made, not

6

28  CLASS ACTION COMPLAINT

1    misleading;

2    iv.   Whether Defendants knew or deliberately disregarded that their statements were false

3    and misleading;

4    v.   Whether the price of BigBand common stock was artificially inflated; and

5    vi.   The extent of damage sustained by Class members and the proper measure of damages.

6    28.    At all relevant times, the market for BigBand securities was an efficient market for the

7    following reasons:

8    i.   BigBand securities were actively traded on NASDAQ, an efficient and automated

9    market;

10    ii.   During the Class Period, thousands of shares of BigBand securities were traded

11    on the open market;

12    iii.   BigBand filed periodic public reports with the SEC and the NASDAQ following

13    the responsibilities of a regulated issuer of stock; and

14    iv.   BigBand was covered by multiple securities analysts employed by different

15    brokerage firms.  Reports were penned by these analysts that were distributed by

16    their respective brokerage firms.  These reports were publicly available and

17    entered the public marketplace.

18    29.    Plaintiff's claims are typical of those of the Class because the market for BigBand

19    securities absorbed current information regarding the Company from all publicly available sources and

20    reflected that information in BigBand's share price.  Under these circumstances, all purchasers of the

21    Company's common shares during the Class Period suffered similar injury through their purchase of

22    shares at artificially inflated prices and presumably relied upon the information publicly available.

23    30.    The members of the Class are so numerous that joinder of all members is impracticable.

24    The disposition of their claims in a class action will provide substantial benefits to the parties and the

25    Court.  Throughout the Class Period, BigBand securities were actively traded on NASDAQ with

26    millions of shares of stock outstanding, owned by hundreds, if not thousands, of persons.  While the

27    exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through

7

28    CLASS ACTION COMPLAINT

1  appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the
2  proposed Class.

3      31.    Plaintiff will adequately protect the interests of the Class and has retained counsel who
4  are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of
5  the Class.

6      32.    A class action is superior to other available methods for the fair and efficient adjudication
7  of this controversy. Furthermore, as the damages suffered by individual Class members may be
8  relatively small, the expense and burden of individual litigation make it impossible for members of the
9  Class to individually redress the wrongs done to them. Plaintiff's counsel is experienced in complex
10 litigation of this nature and there will be no difficulty in the management of this case as a class action.

11                          **SUBSTANTIVE ALLEGATIONS**

12     33.    BigBand recognizes revenue mainly from the sale of products. BigBand's secondary
13 revenue source is derived from the sale of services. In 2006, the sale of products netted BigBand $154.0
14 million in revenue (approximately 87.2% of total net revenue), and the sale of services netted BigBand
15 $22.6 million in revenue (approximately 12.8% of net revenue).

16     34.    BigBand product sales are divided primarily into three markets: TelcoTV, Switched
17 Broadcast video, and data.

18     35.    BigBand's TelcoTV sales have historically been primarily sales to Verizon. The product
19 is however, available to all telephone companies that use a broadband multimedia-service router (BMR)
20 such as BigBand's for the real-time processing and switching of video. BigBand states in its Prospectus
21 that its TelcoTV products are a major attraction to telephone companies for reasons of convenience and
22 cost savings.

23     We enable telephone companies to leverage their existing Synchronous Optical Network, or
       SONET, infrastructure which was originally designed for voice communications, to transport
24     video content throughout the network. **This provides significant cost savings as telephone**
25     **companies are not required to build a dedicated video transport network**.

26     36.    According to BigBand's Prospectus, there are some unique and innovative aspects to
27 BigBand's Switched Broadcast application:

                                          8
28 CLASS ACTION COMPLAINT

Our Switched Broadcast application enables service providers to transmit video channels to
subscribers only when the subscribers in a smaller subset of subscribers within the network,
called a service group, are in the process of watching those channels. Depending on the
number of subscribers and the amount of duplicate channels within a service group, our
Switched Broadcast product application typically allows service providers to achieve up to
50% bandwidth savings in the delivery of digital video content and use the reclaimed
bandwidth to offer additional content.

37.     However, the company's commercial products were hardly that, since BigBand faced

growing undisclosed product implementation woes and serious product commercialization issues that

potentially would have derailed the Company's financial projections claims.

## FALSE AND MISLEADING STATEMENTS ISSUED BY DEFENDANTS

38.     On or about March 14, 2007, BigBand filed with the SEC a Form S-1 Amended

Registration Statement for its IPO. The SEC issued an Effectiveness Order, and the S-1 became effective

March 14, 2007.

39.     From approximately March 14, 2007 to March 20, 2007, the Company sold 7.5 million

shares of BigBand common stock and selling stockholders sold 4.8 million shares, for a total of 12.3

million shares at $13 per share for proceeds totaling $159.9 million.  (Form 8-K, March 20, 2007).

Individual Defendants Bassan-Eskenazi, Oz, Gilbert, and Israely all sold stock as a part of the initial

public offering for a profit of approximately $16.4 million.

40.     In the Prospectus, BigBand represented, among other things, that it had experienced 80%

revenue growth from 2005 to 2006 (from $98.0 million to $176.6 million) and had operated profitably in

the third and fourth quarters of 2006 and overall for the year.  The Registration Statement stated in part:

We develop, market and sell network-based platforms that enable cable operators and
telephone companies, collectively called service providers, to offer video, voice and
data services across coaxial, fiber and copper networks.  We have significant expertise
in rich media processing, communications networking and bandwidth management.
We have delivered what we believe to be the only successful commercial
deployments of switched broadcast, an application that substantially increases the
volume of content that a service provider can offer. In addition, we were the first to
implement what we believe has become the industry's de facto network architecture

9

CLASS ACTION COMPLAINT

for digital simulcast, an application that facilitates the insertion of advertising and the transmission of video in a digital format across a network while still providing service to analog subscribers. Our product applications of Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP are a combination of our modular software and programmable video and data hardware platforms.

Our software and hardware product applications are used by leading service providers worldwide to offer video, voice and data services to tens of millions of subscribers, 24 hours a day, seven days a week. We have sold our product applications to more than 100 customers globally, including Cablevision, Charter, Comcast, Cox, Time Warner Cable and Verizon, which are six of the ten largest service providers in the United States. Our net revenues increased 80.3% to $176.6 million for the year ended December 31, 2006 from $98.0 million in 2005. We have been profitable on a quarterly basis since the three months ended September 30, 2006, and we first achieved profitability on an annual basis in 2006.

41.    In the Company's Registration Statement, BigBand stated that product sales during 2006 were a result of an $87.6 million increase in revenues from video products, partially offset by a $19.6 million decrease in revenues from data products. The Registration Statement further stated that a primary reason for the $87.6 million growth in video product revenues during 2006 was that the Company saw the first recognizable net revenues from BigBand's TelcoTV product:

Net revenues for 2006 were $176.6 million compared to $98.0 million for 2005, an increase of $78.6 million, or 80.3%. Revenues from our top five customers comprised 79% and 69% of net revenues for 2006 and 2005, respectively. During 2006, revenues from customers in the United States comprised 89% of net revenues, and revenues from customers outside the United States comprised 11% of net revenues, compared to the same period in 2005, in which customers in the United States comprised 83% of net revenues, and revenues from customers outside the United States comprised 17% of net revenues.

Products revenues for 2006 were $154.0 million compared to $86.0 million for 2005, an increase of $68.0 million, or 79.2%. This increase was primarily due to a $87.6 million increase in revenues from our video products, partially offset by a $19.6 million decrease in revenues from our data products. The $87.6 million increase in video products was attributable to the first recognition of significant net revenues from our TelcoTV product and significant growth in revenues from our Switched Broadcast product. The decrease in revenues from data products was almost entirely due to $18.8 million of revenues recognized in 2005 following satisfaction of customer acceptance criteria for product shipped to a single customer in 2004.

10

CLASS ACTION COMPLAINT

42.    According to the Registration Statement, BigBand's "sales cycle for an initial customer purchase typically ranges from nine to eighteen months ..." However, "[a]fter initial deployment of our products, subsequent purchase of our products typically have a more compressed sales cycle."

43.    Approximately 89% of BigBand's sales in 2006 were to customers in the United States. BigBand sells its products and services to customers in the United States through a direct sales force.

44.    The Registration Statement described BigBand's sales as highly concentrated among its five largest customers. Over time, sales to those customers became more concentrated, equaling 90% of revenue in the fourth quarter of 2006. The Registration Statement further indicated that sales at the time of the filing were concentrated among four customers: Comcast, Cox, Time Warner Cable and Verizon. Each of these four customers represented more than 10% of sales during 2006:

> A substantial majority of our sales have been to relatively few customers. However, our large customers have changed over time. Sales to our five largest customers represented 79%, 69% and 61% of our net revenues in the year ended December 31, 2006, the year ended December 31, 2005, and the year ended December 31, 2004, respectively, and **were particularly significant in the three months ended December 31, 2006 when they represented approximately 90% of our net revenues.** In 2006, Comcast, Cox, Time Warner Cable and Verizon each represented 10% or more of our net revenues. In 2005, Adelphia, Cox and Time Warner Cable each represented 10% or more of our net revenues. In 2004, Adelphia, Comcast, Cox and Time Warner Cable each represented 10% or more of our net revenues. Although we are attempting to broaden our customer base by penetrating new markets and expanding internationally, we expect continuing customer concentration due to the significant capital costs of constructing service provider networks and industry consolidation. We expect that in future periods a limited number of large customers will continue to comprise a large percentage of our revenues.

45.    In the Company's Prospectus, BigBand stated that the Company had maintained a strong customer commitment demonstrated through its established backlog:

> We schedule production of our products based upon our backlog, open contracts, informal commitments from customers and sales projections. **Our backlog consists of firm purchase orders by customers for delivery within the next six months.** As of December 31, 2006, we had backlog of $36.2 million, compared with backlog of $33.1 million as of December 31, 2005. Anticipated orders from customers may fail to materialize and delivery schedules may be deferred or canceled for a number of

11

CLASS ACTION COMPLAINT

1      reasons, including reductions in capital spending by service providers or changes in
       specific customer requirements. Because of the complexity of our customer
2      acceptance and revenue recognition criteria, in addition to backlog, we have
       significant deferred revenues. As a result, our backlog alone is not necessarily
3      indicative of revenues for any succeeding period.

4          46.     BigBand reported $56.7 million in net revenue and $8.9 million in net income for the
5
       fourth quarter of 2006 according to the Prospectus.
6

7          47.     The statements referenced above were each materially false and misleading because they

8      failed to disclose and misrepresented at least the following adverse facts: (1) that the Company had

9      distorted the growth in its sales through the method of channel stuffing on sales of TelcoTV products to

10     Verizon prior to the IPO; and (2) BigBand was experiencing delays in customer acceptance of customer

11     specific products due to difficulty in customizing these products.

12
           48.     In reliance on the truth and accuracy of the representations contained in the Prospectus
13
       with respect to BigBand's business, BigBand common stock traded from March 15, 2007 (the first day
14
       BigBand common stock traded) and May 3, 2007 between $17.00 and $21.43 per share.
15

16         49.     On May 3, 2007, after the close of trading on U.S. securities markets, BigBand issued a

17     press release reporting first quarter 2007 financial results.  For the quarter ended March 31, 2007,

18     BigBand reported net revenues of $52.8 million (62% over the prior year) and a GAAP net loss of $1.0

19     million or ($0.05) per diluted share. The company reported that non-GAAP results (excluding certain
20
       non-cash charges) were $5.8 million, or $0.09 per diluted share.  (Form 8-K, May 3, 2007).
21

22         50.     Defendants Bassan-Eskenazi-Eskanazi was quoted in the press release as stating:

23     During the quarter, we continued to see an expansion of our installed base of solutions
       and of the capacity of our existing footprint, which favorably benefited our gross
24     margin.
                                         * * *
25     We are delighted to report strong financial results for the first quarter of 2007, our
       first quarter as a public company.  Some of the world's largest cable and
26     telecommunications carriers continue to demonstrate interest in our media services

27

28                                          12
       CLASS ACTION COMPLAINT

1    platforms, built upon a unique combination of networking, video processing, and
2    bandwidth management capabilities.

3    We believe that our financial achievements to date demonstrate the increasing
     consumer demand for more and better video services, including high-definition
4    programming. Our growth continues to be a function of the broader adoption of our
     switched broadcast solution by major cable operators and the increasing deployment
5    of television services by telecommunications carriers, among many other initiatives.

6    Looking ahead, we are optimistic about our business and long-term market
     opportunity. We expect to further leverage our platform and gain footprint with new
7    customers in new geographies. BigBand Networks continues to innovate, and we
8    believe our technology will remain a key point of differentiation in the future.

9        51.    The May 3, 2007 press release reported that management anticipated net revenues for the

10   second quarter of 2007 would be in the range of approximately \$52 to \$56 million and that GAAP

11   earnings per share would be in the range of \$0.02 to \$0.06 per share. For 2007, net revenues were

12   anticipated to be in the range of approximately \$225 to \$230 million, and GAAP earnings per share were

13   anticipated to be in the range of \$0.06 to \$0.11 per share.

14

15       52.    On a conference call conducted immediately after the issuance of the May 3, 2007 press

16   release, Defendant Bassan-Eskenazi stated that BigBand's "switched broadcast solution continue to be a

17   major driver of our business... We are now deploying our fourth-generation switched broadcast product,

18   while many competitors are still developing their first and switched broadcast is a fraction of the cost of

19   competing alternatives.... Time Warner Cable was the first major cable operator to adopt switched

20   broadcast. During the first quarter of 2007, we recognized revenue associated with Cablevision's

21
22   deployment of switched broadcast, the second [Multiple System Operator] to adopt our solution."

23       53.    Bassan-Eskenazi further stated that BigBand was seeing "continuing demand for [its]

24   TelcoTV solutions" in the first quarter:

25   BigBand carrier-grade platform is deployed at the edge of our Telco customers'
     networks and is used to ensure reliable and efficient delivery of TV programming. We
26   continue to support the ongoing rollout of Verizon's FiOS TV. Our ability to
27   successfully deploy with this important customer gives us the confidence in our

                                        13
28   CLASS ACTION COMPLAINT

1    platform fit for TelcoTV, as well as validates our ability to add value to this important
2    market segment.

3    54.    On that same conference call, Defendant Ball assured investors that he had good visibility
4    on projecting second quarter operations and at the end of the second quarter would have an equally good
5    basis for projecting third quarter operations: "I still view the world as a kind of six- month window. I
6    have a ... pretty good view of Q2. I have a little bit less so view of Q3. There are some things that have
7    to happen in Q2 for me to fill in Q3...."

8    55.    With regard to certain orders where the products had not yet been deployed, Ball stated
9    that "our typical pattern from switched broadcast orders is kind of a six-to-nine month window to
10   revenue or sign-off by the customers," and those orders where products had not been deployed were not
11   included in current period projections.

13   ## ADVERSE FACTS HIDDEN FROM THE PUBILC, NOW REVEALED

14   56.    On August 2, 2007, after the close of the U.S. securities markets, BigBand issued a press
15   release reporting second quarter 2007 operating results. Net revenues for the second quarter were
16   reported at $54.5 million (43% over the prior year). GAAP net income for the quarter was $1.7 million,
17   or $0.02 per diluted share. Defendant Bassan-Eskenazi was quoted in the press release as stating:

19       We are pleased with our improvements in both revenues and earnings results in the second
         quarter. We continued to drive significant expansion of the footprint of our media service
20       platforms. We continue to work closely with customers in supporting their efforts to
         enhance their existing networks for advanced video services. We believe that BigBand's
21       solutions for switched broadcast and TelcoTV will continue to gain traction with major
         customers both in the U.S. and internationally.

                                            * * *
23       Video continues to be a major driver of capital expenditures in service provider networks.
24       We believe that our technology, innovation and time-to-market leadership are key
         competitive differentiators in our video and data markets. Our product roadmap calls for
25       more innovation as the industry moves to addressable advertising and personalized video
         services. **We continue to be well positioned for additional growth over the long-term
26       and are optimistic about our business.** [emphasis added]

28                                          14
CLASS ACTION COMPLAINT

57.    The August 2, 2007 press release added that management's current expectations for the third quarter were net revenues of approximately $54 to $58 million, and GAAP earnings (loss) per share in the range of ($0.01) to $0.03 per share. The Company again indicated that net revenues were anticipated to be in the range of approximately $225 to $230 million, and that GAAP earnings per share were anticipated to be in the range of $0.03 to $0.08 per share. This was less than previous Company forecasts for revenues and earnings.

58.    On a conference call conducted on August 2, 2007, immediately after issuance of the August 2, 2007, press release, Defendant Bassan-Eskenazi sought to quell investor discontent caused by the reduced income forecast. Bassan-Eskenazi assured investors that "[w]e are growing our top-line as a direct impact of the healthy demand for the unique video solutions which drive strategic footprint growth with key customers." Bassan-Eskenazi added that "[t]he competition among cable, satellite and telecom providers is accelerating, and is causing all of them to invest heavily and add new capabilities to their network. As a result of these growing industry trends, in the second quarter we experienced footprint growth, meaningful design wins, and significant milestones."

59.    On September 27, 2007, after the close of trading on U.S. securities markets, BigBand announced in a press release entitled "BigBand Networks Announces Revised Revenue Outlook for Third Quarter of 2007" that it was revising "its revenue outlook for the third quarter ending September 30, 2007." The Company now expected to "report revenue for the third quarter in the range of $35 to $39 million," which was "below the Company's previous guidance of $54 to $58 million" by as much as 23 million. BigBand's revised revenue forecast for the third quarter reflected no revenue growth over revenue for the third quarter of 2006.

60.    BigBand attributed the reduced revenue outlook "to several coincident factors":

15

CLASS ACTION COMPLAINT

i.     Referencing the deployment of switched digital video across "an expanding number of customers and configurations," BigBand explained that "[s]ome ... deployments have required more software customization and integration than originally expected. This impacted the Company's ability to recognize switched digital revenue for some deployments in the third quarter";

ii.    Because a "major customer" (presumably Verizon) "worked through some previously purchased inventory" TelcoTV revenue was reduced;

iii.   BigBand "experienced continued softness in its data business."

61.    The September 27, 2007, press release added that "[a]s a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007." Bassan-Eskenazi's comments in the press release included in relevant part:

> While we believe the market for our video solutions continues to be strong and are confident in our roadmap for the long term, we are clearly disappointed in our execution this quarter. We are aggressively addressing these issues and will provide more specifics in our announcement of third quarter financial results in early November.
>
> \* \* \*

62.    Once the true status of BigBand's product development problems came to light, BigBand was forced to reveal to the market its current and potential depressed financial performance and outlook. In response to this negative news, the market quickly reacted. Shares of the Company's stock fell $2.67 per share, or 29.4 percent, to close, on September 28, 2007, at $6.40 per share.

63.    Morgan Keegan analyst Simon Leopold cut his rating on the stock to market perform from outperform. Jefferies & Co. also cut its rating on the company to hold from buy, reducing 2007 revenue estimates to $181.7 million from $224.6 million. Jefferies analyst George Notter said in a research note, "[w]e recommend that investors stay on the sidelines."

16

CLASS ACTION COMPLAINT

1    64.    The nearly 28% decline in the price of BigBand Networks stock on August 3, 2007, and

2    the subsequent 29% decline on September 28, 2007, at the end of the Class Period, were the direct result

3    of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The

4    timing and magnitude of BigBand Networks' stock price declines negate any inference that the loss

5    suffered by Plaintiff and other Class members was caused by changed market conditions,

6    
7    macroeconomics or industry factors or Company-specific facts unrelated to the Defendants' fraudulent

8    conduct.

9    ## POST CLASS PERIOD REVELATIONS

10    65.    On October 18, 2007, Frederick Ball stepped down as Chief Financial Officer of

11    BigBand. The arrangement called for his employment to end November 26, 2007, with the Company

12    option to continue use of his consultation services through May 1, 2008.

13    

14    66.    On October 30, 2007, BigBand announced the results of its operations for the third

15    quarter ended September 30, 2007. The Company reported a net loss of $2.7 million or ($0.05) per

16    diluted share in the third quarter compared to net income of $3.5 million, or $0.06 per diluted share in

17    the third quarter of 2006. The Company also announced a restructuring plan that would reduce its

18    workforce by 15%.

19    ## NO SAFE HARBOR

20    
21    67.    The statutory safe harbor provided for forward-looking statements under certain

22    circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The

23    statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In

24    addition, to the extent certain of the statements alleged to be false may be characterized as forward

25    looking, they were not identified as "forward-looking statements" when made, there was no statement

26    made with respect to any of those representations forming the basis of this Complaint that actual results

27    
28    
17

CLASS ACTION COMPLAINT

"could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statement was false.

68. The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

**COUNT I**
**Against All Defendants For Violation of Section 11**
**of the Securities Exchange Act**

69. Plaintiff incorporates Paragraphs 1 - 68 by reference, except those claims sounding in fraud, as if set forth in full herein.

70. This claim is brought by Plaintiff and all other members of the Class who obtained BigBand securities pursuant to the Registration Statement. Each Class member acquired their shares pursuant to or traceable to, and in reliance on, the Prospectus.

71. The Individual Defendants each filed the Prospectus with the SEC and distributed it to investors and/or signed the IPO Registration Statement.

72. All Defendants as signatories of the Registration Statement and the Prospectus, directors and/or officers of BigBand and controlling persons of the issuer, owed to the purchasers of the stock, including Plaintiff and the Class, the duty to make a reasonable and diligent investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus, at the time they became effective, were true or that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

18

CLASS ACTION COMPLAINT

73.     BigBand is the issuer of the securities sold via the Registration Statement. As issuer of the securities, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

74.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Prospectus, which misrepresented or failed to disclose, inter alia, the facts set forth above. These omissions were a violation of SEC Regulation S-K, Item 303(a), which requires that trends which will have a material effect on a registrant's results be disclosed.  By reason of the conduct herein alleged, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

75.     As a direct and proximate result of Defendants' acts and omissions in violation of the Securities Act, Plaintiff and the Class suffered substantial damage in connection with their ownership of BigBand securities pursuant to the Registration Statement and the Prospectus.

76.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from each of the Defendants jointly and severally.

## COUNT II
### Against Individual Defendants For Violations of
### Section 15 of The Securities Act

77.     Plaintiff incorporates Paragraphs 1 - 76 by reference, except those claims sounding in fraud, as if set forth in full herein.

78.     This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

19

CLASS ACTION COMPLAINT

1    79.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at

2    the time set forth herein, controlling persons of BigBand with respect to the Registration Statement and

3    Prospectus, within the meaning of Section 15 of the Securities Act. Individual Defendants had the

4    power and influence to cause and did cause BigBand to engage in the acts described herein.

5
6    80.    The positions Individual Defendants held made them privy to and provided them with

7    actual knowledge of the material facts concealed from Plaintiff and the Class.

8    81.    By virtue of the conduct alleged herein, Individual Defendants are liable for the wrongful

9    conduct asserted under this claim and Count I and are liable to Plaintiffs and the Class for damages

10   suffered.

11
### COUNT III

12

### Against Defendants BigBand Networks Inc., Amir Bassan-Eskenazi, and
13   ### Frederick A. Ball For Violation of § 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants
14

15   82.    Plaintiff incorporates Paragraphs 1 - 81 by reference, as if set forth in full herein.

16   83.    During the Class Period, Defendants, individually and in concert, directly or indirectly,

17   disseminated or approved the false statements specified above, which they knew or deliberately

18   disregarded were misleading in that they contained misrepresentations and failed to disclose material

19   facts necessary in order to make the statements made, in light of the circumstances under which they

20   were made, not misleading to Plaintiff and other members of the Class, and employed manipulative or

21   deceptive devices and contrivances in connection with the purchase and sale of BigBand securities.

22

23   84.    The purpose and effect of Defendants' plan, scheme and course of conduct was to

24   artificially inflate the price of BigBand's securities and to artificially maintain the market price of

25   BigBand securities.

26

27

28   20
CLASS ACTION COMPLAINT

85.    Individual Defendants Bassan-Eskenazi and Ball, who were the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose true facts in the statements made by them or other BigBand personnel to members of the investing public, including Plaintiff and the Class, and the securities analysts.

86.    As a result of the foregoing, the market price of BigBand securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements concerning the operating results and performance of BigBand, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of BigBand securities during the Class Period in purchasing BigBand securities at prices which were artificially inflated as a result of Defendants' false and misleading statements.

87.    Had Plaintiff and the other members of the Class known of the material adverse information which Defendants did not disclose, they would not have purchased BigBand securities at the artificially inflated prices that they did.

88.    Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased BigBand securities in ignorance of the financial risk to them as a result of such nondisclosures.

89.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

90.    By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

91.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other

21

CLASS ACTION COMPLAINT

1  members of the Class suffered damages in connection with their respective purchases and sales of the

2  Company's common stock during the Class Period and are entitled to the substantial damages which

3  they suffered in connection with their purchases of BigBand securities during the Class Period.

### COUNT IV
### Against Individual Defendants
### For Violation of § 20(a) of the Exchange Act

7  92.    Plaintiff incorporates Paragraphs 1-91 by reference, as if set forth in full herein.

8  93.    By virtue of their high-level positions as officers and/or directors of BigBand and

9  ownership of BigBand stock, participation and or awareness of the Company operations, and/or intimate

10  knowledge of the false financial statements filed by the Company with the SEC and disseminated to the

11  investing public, the Individual Defendants acted as controlling persons of BigBand within the meaning

12  of Section 20(a) of the Exchange Act. The Individual Defendants had the power and authority to cause,

13
14  and did cause BigBand to engage in the wrongful conduct complained of herein.

15  94.    Each of the Individual Defendants had the power to control or influence the unlawful

16  conduct and practices complained of herein by causing BigBand to disseminate the false and misleading

17  information referred to above.

18  95.    By reason of such conduct, the Individual Defendants have violated Section 20(a) of the

19  Exchange Act.

20
21  96.    By virtue of the conduct alleged above, the Individual Defendants are liable to the

22  Plaintiff and the other members of the Class for the substantial damages that they suffered in connection

23  with their purchases of BigBand's securities during the Class Period.

24  **WHEREFORE**, Plaintiff, on his own behalf and on behalf of the other members of the

25  Class, demands judgment against the Defendants as follows:

26

27

28
22

CLASS ACTION COMPLAINT

1    A.    Determining that this action is a proper class action pursuant to Rule 23 of the Federal

2   Rules of Civil Procedure and certifying Plaintiff as the Class Representative and his counsel as Class

3   Counsel;

4    B.    Declaring and determining that Defendants violated the federal securities laws by

5 
6   reason of their conduct as alleged herein;

7    C.    Awarding Plaintiff and members of the class compensatory damages against all

8   Defendants, jointly and severally for all damages sustained as a result of the Defendants' wrongful

9   acts and transactions complained of herein, together with prejudgment interest from the date of the

10  wrongs to the date of the judgment herein;

11    D.    Awarding Plaintiff and the class the costs, expenses, and disbursements incurred in

12 
13  this action, including reasonable attorneys' and experts' fees; and

14    E.    Awarding Plaintiff and the other members of the Class such other and further relief as

15  the Court may deem just and proper.

16                          **JURY DEMAND**

17  Plaintiff demands a trial by jury.

18 

19  DATED: November 15, 2007

20 

21                             Laurence D. King (SBN 206423)
                               lking@kaplanfox.com

22                             KAPLAN FOX & KILSHEIMER LLP
                               350 Sansome Street, Suite 400

23                             San Francisco, CA 94104
                               Telephone: 415-772-4700

24                             Facsimile:  415-772-4707

25                             Local Counsel for Plaintiff

26 

27 

28                                  23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Karen H. Riebel
khriebel@locklaw.com
Elizabeth R. Odette
erodette@locklaw.com
LOCKRIDGE GRINDAL NAUEN P.L.L.P
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

Jayne Goldstein
MAGER & GOLDSTEIN LLP
1640 Town Center Circle, Suite 216
Weston, FL 33326
Telephone: 954-515-0123
Facsimile: 954-515-0124

Carolyn G. Anderson
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone : (612) 341-0400
Facsimile:    (612) 341-0844

Joel Strauss
jstrauss@kaplanfox.com
Jeffrey Campisi
jcampisi@kaplanfox.com
KAPLAN FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: 212-687-1980
Facsimile:   212-687-7714

Attorneys for Plaintiff

24

CLASS ACTION COMPLAINT

## PLAINTIFF CERTIFICATION

I, __EUGENE L. HAMMER__ hereby state:

1. I have reviewed a Complaint against BigBand Networks, Inc., and certain of its officers and directors, and authorized the filing of the same or a similar complaint on my behalf.

2. I did not purchase any BigBand Networks, Inc. securities at the direction of counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. The following includes all of my transactions in BigBand Networks, Inc. securities during the Class Period (March 14, 2007 through September 27, 2007) as defined in the Complaint:

| **TRANSACTION** | **TRADE DATE** | **PRICE** | **QUANTITY** |
|---|---|---|---|
| (PURCHASE, SALE, EXCHANGE, CALL, PUT, ETC.) | | | |

__SEE ATTACHED LIST__

5. I have filed the following civil actions as a representative party on behalf of a class under the federal securities laws during the last three years:

6. I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __1ST__ day of __NOVEMBER__, 2007.

_Eugene L Hammer_
(signature)
__EUGENE L. HAMMER__
(print name)
__CHATHAM__
(county of residence)

374973-1

| Date Acquired | Quantity | Cost per Share |
|---------------|----------|----------------|
| 4/30/2007 | 200.0000 | $20.46 |
| 4/30/2007 | 200.0000 | $20.49 |
| 4/30/2007 | 300.0000 | $20.52 |
| 4/30/2007 | 800.0000 | $20.53 |
| 4/30/2007 | 2,500.0000 | $20.54 |
| 5/07/2007 | 600.0000 | $18.93 |
| 5/07/2007 | 1,400.0000 | $18.94 |